[No. B212766. Second Dist., Div. Three. May 13, 2010.]

ROBERT GARBER, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for partial publication. The portions of this opinion to be deleted from publication are those portions enclosed within double brackets, [[ ]].

## COUNSEL

Maxine Weksler for Petitioner.

No appearance for Respondent.

Rockard J. Delgadillo and Carmen A. Trutanich, City Attorneys, Debbie Lew, Assistant City Attorney, Eric Shannon and Rick V. Curcio, Deputy City Attorneys, for Real Party in Interest.

## OPINION

**KLEIN, P. J.**—Petitioner Robert Garber has filed a habeas corpus petition challenging a decision by the appellate division of the superior court that

affirmed his conviction, after a jury trial, for carrying a concealed firearm in a vehicle and carrying a loaded firearm in a public place or on a public street (Pen. Code, §§ 12025, 12031).[1] Garber was put on probation for five years.

The only relief to which Garber is entitled is to have his sentence modified.

In the published portion of the opinion, we address Garber's contention that, because he lived in his trailer, the jury should have been instructed on the statutory exemptions to sections 12025 and 12031, which permit the possession of loaded and concealed firearms in "places of residence."

We conclude there was no instructional error. The statutory place of residence exemptions did not apply in this case. At the time he committed these offenses, Garber was not using his mobilehome for residential purposes and, therefore, he was not entitled to have the jury instructed on a "place of residence" defense.

## FACTUAL BACKGROUND

### 1. *Prosecution evidence.*

Between 6:30 and 6:45 p.m. on November 6, 2006, off-duty firefighter Cliff Sorensen drove his Jeep Wrangler to Hjelte Sports Center, a public park in Los Angeles, for a softball game with friends and colleagues. Hjelte park is equipped for sports and other daily activities; it has no campsites or overnight stalls with hookups for recreational vehicles or trailers. The park opens at 5:00 a.m. and closes at 10:30 p.m., when the gates surrounding the park are locked. Under the Los Angeles Municipal Code, overnight camping is prohibited and it is unlawful to remain in the park after closing.

Sorensen's softball game was scheduled to begin at 7:30 p.m. The field lights had not yet been turned on, so he drove his Jeep into a dirt parking area. Not seeing anyone in the near vicinity, Sorensen began "driving around, playing in the dirt." Sorensen did see petitioner Garber's van and trailer parked about 150 to 200 feet away across the dirt parking area. Sorensen drove around, kicking up dust, for 30 or 45 seconds. Then he parked his Jeep in one of the paved parking spaces.

Sorensen was still sitting there when he noticed Garber walking toward him. Realizing the wind must have blown some of the dust toward Garber's trailer, Sorensen put his hand up apologetically and said he was sorry. Garber did not say anything and just kept walking toward Sorensen, who said: "My

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

bad. I'm sorry. I didn't see you. I didn't mean to dust you. I apologize." When Garber got closer to the Jeep, Sorensen could see he had a gun. It was a black semiautomatic handgun and Garber was holding it down at his side, pointed toward the ground. Garber was now less than 20 feet from the Jeep. Sorensen testified he felt threatened: "By the way he's coming at me, I know I may have pissed him off. And he's basically bringing a gun to a conversation." Garber kept walking toward Sorensen "in an angry manner" with the gun at his side. Sorensen began to drive away slowly. As he did so, he leaned out of his Jeep and yelled, "You're an idiot. Why the heck did you pull a gun on me? You're an idiot." Garber did not say anything. Sorensen drove off.

When Sorensen returned to the park a short time later, his teammates had started to arrive for the softball game. Noticing Garber's trailer was still there, Sorensen turned off his headlights and his engine, and rolled quietly into a parking space to avoid any further confrontation. As he got out of the Jeep, he was approached by Joseph Chervansky who yelled at him about kicking up dust. Garber was following behind Chervansky. Sorensen said, "I apologize again, but your buddy pulled a gun." Sorensen's teammates got in between Sorensen and Chervansky. When one of the umpires heard about the gun, he said, "Well, I'm not going to work a game where there's a gun . . . . I've had that problem before. We need to call the cops." Somebody called the police, who arrived 10 minutes later. By that time, Garber and Chervansky had walked away from Sorensen's Jeep.

Javier Barragan and Sean Hennessy were the officers who responded to the call. They worked for the Los Angeles General Services Police Department, which patrols municipal sites like parks and libraries. Sorensen told them about Garber's gun and indicated Garber had returned to his trailer. The officers went over to the trailer and ordered Garber to come out. Garber was upset as he left his trailer and he screamed at the officers. Told he was being detained on suspicion of brandishing a firearm, Garber said, "I have a gun in the trailer. It is in a drawer." Officer Hennessy entered the trailer. He found a semiautomatic .380-caliber handgun in a drawer next to the sink area. The barrel was about four inches long and the gun was concealable. There was one bullet in the chamber and five in the magazine. Hennessy testified he could see that Garber's van and trailer were connected. Barragan testified, "Both vehicles were attached through a trailer hitch."

2. *Defense evidence.*

Joseph Chervansky testified he was acquainted with Garber because they both walked their dogs at Hjelte park. On the night of the incident, Chervansky parked his car in the dirt parking area, about 20 feet behind Garber's trailer. Sorensen drove up at an excessive speed, about 50 miles per hour, and

then did six or seven "circles, or what they call donuts," creating a dust storm. Sorensen came within 10 feet of Garber's trailer. Chervansky sounded his horn because he thought Sorensen was either going to crash into his car or into Garber's trailer. When the dust cleared, he saw Garber standing in the doorway of his trailer. Chervansky did not see Garber holding a gun and he did not see Garber step outside the trailer.

Sorensen left the park and came back 15 minutes later. Chervansky told Garber the Jeep had returned. Chervansky walked over to the Jeep in order to write down its license number. Garber was following behind him. As Chervansky was writing down the license number, Sorensen said, "You don't know who you're messing with. I'm L.A.P.D." Sorensen did not apologize for stirring up the dust; instead, he laughed at Garber. Garber was calm; he was not shouting. Chervansky denied yelling at Sorensen. After getting the Jeep's license number, Chervansky returned to his own car.

Frank Castillo testified he was working as security that night, guarding some film trucks parked in the dirt area at Hjelte park. He saw Garber's trailer and van parked in the dirt area. A Jeep drove up at 45 or 50 miles per hour, coming within five or 10 feet of Garber's trailer. The Jeep spun around and started "doing all kinds of crazy stuff, picking up all kinds of dirt . . . ." Castillo testified: "[T]here was kids playing, there was ˚people walking around. I was scared for them, and I was scared for my trucks." He heard Garber shouting at Sorensen about the dust. Then Sorensen sped away while yelling, "Call the cops. Call the cops," as if daring Garber to call them. Castillo never saw Garber with a gun.

Garber testified he went to Hjelte park at 5:00 p.m. that day to walk his dog. This was something he often did. At the time of his encounter with Sorensen, Garber's van and trailer were located in the public parking lot. He was waiting inside his trailer for the park lights to come on so he could walk his dog safely.

Garber described the trailer as his home: "It has a range, refrigerator. It has . . . furniture. It has a shower, a toilet. It has . . . closets and drawers, a dinette. And it's where I live." He called it a "trailer coach, a travel trailer."

Garber testified Sorensen drove into the parking area at 50 or 60 miles per hour, creating dust clouds. Garber was startled and feared the Jeep was going to hit his trailer. "I couldn't move the trailer, because I had first to go to the van, hook the trailer, and then drive away. That is very, very difficult, and it's impossible to do in fraction of second.[2] [¶] Then, the first thought, it was to

---

[2] Garber, who apparently is not a native speaker, often testified in nonidiomatic English.

get the gun. I didn't know that person, but I know that in public park there are psychopath, there are gang member, there are all kind of criminal, the sick, the refuse of the park, because they cannot go anywhere else." "Now, that gun that I have, it for self-defense. I got the gun and I stood on the doorway on my trailer, holding it alongside my body. And I'm . . . holding my gun alongside my left side. I really didn't know what to do. If I were a police officer, I would shoot him—. . . [¶] . . . [¶]—1500 time."

Garber heard Chervansky honking his horn and he saw the Jeep do five or six donuts. Then Sorensen drove off. Garber claimed that during this initial encounter with Sorensen he did not leave the doorway of his trailer.

After the park lights came on, Chervansky knocked on Garber's trailer to say the Jeep had returned. Garber approached Sorensen and said, "Sir, are you on drug? Why did you do this?" Sorensen ignored him, turned to another softball player and said, "He had a gun before." Chervansky took down Sorensen's license plate number. Garber told Sorensen, "I am done with this. Please don't approach my vehicles no more." Garber and Chervansky turned to go, but Sorensen approached Chervansky, "went up to him, on his face like this, and told him, . . . 'You don't know who you're messing with. I'm L.A.P.D. officer.' "

Garber returned to his trailer. Ten minutes later, police officers arrived and ordered him to come out. They asked if he had a gun and he told them it was in the trailer. Garber testified he never heard Chervansky yelling during the incident and that Sorensen never apologized.

## PROCEDURAL BACKGROUND

Garber was charged with three misdemeanors: brandishing a firearm (§ 417, subd. (a)(2)); carrying a concealed firearm in a vehicle (§ 12025, subd. (a)(1)); and, carrying a loaded firearm in a public place (§ 12031, subd. (a)). He represented himself at trial. The jury acquitted him of brandishing, and convicted him on the other two counts. On October 21 2008, the appellate division of the Los Angeles Superior Court affirmed his convictions.

On November 25, 2008, Garber's application to transfer the case to this court was denied because he had failed to submit an adequate record or state facts supporting the relief he requested. On December 12, 2008, the Supreme Court struck Garber's petition for review because the decision to deny transfer of a case within the appellate jurisdiction of the superior court is not reviewable.

On December 16, 2008, Garber filed in this court a pro se document entitled "Request for Rehearing or Writ of Mandate." We appointed counsel to represent him and subsequently issued an order to show cause which deemed Garber's pro se filing a petition for writ of habeas corpus.

## CONTENTIONS

1. The trial court erred by not instructing the jury on the "place of residence" exemptions to sections 12025 and 12031.

2. If Garber was not entitled to the "place of residence" jury instructions, his convictions violated the Second Amendment.

3. The trial court erred by not instructing the jury on self-defense.

4. The trial court erred by imposing a five-year probationary term.

## DISCUSSION

1. *Trial court did not err by refusing to give "place of residence" jury instructions.*

Garber contends the jury should have been instructed on the statutory exemptions to sections 12025 and 12031, which permit the possession of loaded and concealed firearms in "places of residence," because he lived in his trailer. This claim is meritless.

a. *The statutory scheme.*

"The general purpose of The Dangerous Weapons[] Control Law (§ 12000 et seq.) is to control the threat to public safety in the indiscriminate possession and carrying about of concealed and loaded weapons." (*People v. Melton* (1988) 206 Cal.App.3d 580, 589 [253 Cal.Rptr. 661].)

Section 12025, subdivision (a), provides: "A person is guilty of carrying a concealed firearm when he or she . . . [¶] (1) [c]arries concealed within any vehicle which is under his or her control or direction any pistol, revolver, or other firearm capable of being concealed upon the person."

Section 12026, subdivision (a), in pertinent part, provides: "Section 12025. shall not apply to or affect any citizen of the United States or legal resident over the age of 18 years . . . who carries, either openly or concealed, anywhere within the citizen's or legal resident's *place of residence*, place of business, or on private property owned or lawfully possessed by the citizen or

legal resident any pistol, revolver, or other firearm capable of being concealed upon the person." (Italics added.)

Section 12026.1 provides, in pertinent part: "(a) Section 12025 shall not be construed to prohibit any citizen of the United States over the age of 18 years who resides or is temporarily within this state . . . from transporting or carrying any pistol, revolver, or other firearm capable of being concealed upon the person, provided that the following applies to the firearm: [¶] (1) The firearm is within a motor vehicle and it is locked in the vehicle's trunk or in a locked container in the vehicle other than the utility or glove compartment. [¶] (2) The firearm is carried by the person directly to or from any motor vehicle for any lawful purpose and, while carrying the firearm, the firearm is contained within a locked container. [¶] . . . [¶] (c) As used in this section, 'locked container' means a secure container which is fully enclosed and locked by a padlock, key lock, combination lock, or similar locking device."

Section 12031, subdivision (a)(1), provides in pertinent part: "A person is guilty of carrying a loaded firearm when he or she carries a loaded firearm on his or her person or in a vehicle while in any public place or on any public street in an incorporated city . . . ."

Section 12031, subdivision (j)(1), provides: "Nothing in this section is intended to preclude the carrying of any loaded firearm, under circumstances where it would otherwise be lawful, by a person who reasonably believes that the person or property of himself or herself or of another is in immediate, grave danger and that the carrying of the weapon is necessary for the preservation of that person or property. As used in this subdivision, 'immediate' means the brief interval before and after the local law enforcement agency, when reasonably possible, has been notified of the danger and before the arrival of its assistance. [¶] . . . [¶] Upon trial for violating this section, the trier of fact shall determine whether the defendant was acting out of a reasonable belief that he or she was in grave danger."

Section 12031, subdivision (*l*), provides: "Nothing in this section shall prevent any person from having a loaded weapon, if it is otherwise lawful, at his or her *place of residence*, including any temporary residence or campsite." (Italics added.)

b. *The charges against Garber.*

Garber concedes "his loaded handgun was concealed in a drawer in [his] trailer."

Count 2 of the complaint charged Garber with carrying a concealed firearm in a vehicle (§ 12025, subd. (a)(1)). The jury was instructed with CALCRIM

No. 2522: "To prove that defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant caused a firearm capable of being concealed on the person to be concealed while it was carried within a vehicle; [¶] 2. The defendant knew that (he) caused the firearm to be concealed in the vehicle; [¶] 3. The firearm was substantially concealed within the vehicle; [¶] AND [¶] 4. The defendant was in the vehicle during the time the firearm was concealed there."

Count 3 of the complaint charged Garber with carrying a loaded firearm in his vehicle (§ 12031, subd. (a)). The jury was instructed with CALCRIM No. 2530: "The defendant is charged . . . with unlawfully carrying a loaded firearm . . . (in a vehicle). [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant carried a loaded firearm . . . (in a vehicle); [¶] 2. The defendant knew that (he) was carrying a firearm; [¶] AND [¶] 3. At that time, the defendant was in a public place or on a public street . . . ."

As to both counts, the jury was given the following definition of "vehicle": "A vehicle is a device by which any person or property may be propelled, moved, or drawn upon a highway, excepting a device moved exclusively by human power or used exclusively upon stationary rails or tracks. [¶] A trailer qualifies as a 'vehicle.'"

Based on *People v. Foley* (1983) 149 Cal.App.3d Supp. 33 [197 Cal.Rptr. 533], the trial court also instructed the jury: "A person who carries a loaded and/or concealed firearm in a vehicle on a public street or on public property is subject to prosecution under Penal Code sections 12025 and 12031 regardless of whether the vehicle has the capacity to function or does function as a 'home' or 'place of residence' when legally upon private property."

Finally, although the jury was instructed on self-defense in connection with the brandishing charge (count 1), the jury was told the self-defense instructions did not apply to counts 2 and 3.

### c. *Appellate division opinion.*

The appellate division rejected Garber's claim he was entitled to have the jury instructed on the "place of residence" statutory defense contained in sections 12026, subdivision (a), and 12031, subdivision (*l*). The appellate division held Garber was not covered by this exemption because, at the time of the offenses, he was using his trailer as a means of transportation, not as a residence.

The appellate division reasoned: "[T]he evidence showed that defendant drove to the park to walk his dog. Defendant's van and trailer were parked in

a public parking lot at a city park. . . . [T]he park closes at 10:30 p.m., at which time the gates are locked. Defendant therefore could not have been camping at the park overnight. [¶] Based on the foregoing, it is evident that defendant's trailer was parked in a public place that was not intended for residential use. Defendant's apparent position is that he was entitled to possess a concealed and loaded firearm in his trailer, at all times, because he actually lives in his trailer. However . . . the purpose of 'The Dangerous Weapons Control Law' would be frustrated if a vehicle equipped for residential use, such as defendant's trailer, was exempt from the regulations of sections 12025 and 12031 while being used as a means of transportation and located on public property. The dispositive issue in these circumstances is whether defendant's trailer was located on public property designed for residential use, such as an overnight campground, and the facts clearly show that such use was not permitted at the park. Indeed, defendant's own testimony suggested that he was only temporarily at the park to walk his dog and would not be staying there overnight. Accordingly, defendant's trailer was not a 'place of residence' . . . ."

### d. *The relevant case law.*

Garber's contention that his trailer falls within the "place of residence" exemption is predicated on *People v. Marotta* (1981) 128 Cal.App.3d Supp. 1 [180 Cal.Rptr. 611], which involved a taxicab driver who was carrying a loaded handgun in his cab for protection while he was working. The defendant was convicted of the same two offenses as Garber. The majority opinion in *Marotta* said:

"[W]e are presented with this question on appeal: Does the 'place of business' exception within Penal Code section 12026 and Penal Code Section 12031 subdivision (h)[3] include a taxicab?

"In any ordinary sense the taxicab here is as much a place of business as a store in a fixed location. This is where the cab driver worked and collected his fees. The driver had no other business location which the cab served to facilitate, such as a store's delivery truck, where the truck is not the location of the enterprise, but merely the means to facilitate the store's business.

"The obvious purpose of the 'place of business' exception in these code sections is recognition of the need of business operators to protect their property.

---

[3] Section 12031, subdivision (h), in pertinent part, provides: "Nothing in this section shall prevent any person engaged in any lawful business . . . from having a loaded firearm within the person's place of business . . . ."

"The term 'place of business' has no set or established meaning in California case or code law. Importing into these words the limitation of a fixed geographic location is unsupported in the law. In California's highly mobile culture many business enterprises have no fixed geographic location. Even such staid institutions as banks often use mobile facilities.

"A claim that our interpretation of the meaning of these statutes would present endless problems to law enforcement or grossly proliferate public possession of guns because of California's many and varied mobile places of business, ought to properly be addressed to the Legislature. . . . Had the Legislature intended to limit the 'place of business' exception to fixed geographic locations, or had it intended to exclude vehicles from the compass of the words 'place of business,' it could easily have done so." (*People v. Marotta, supra*, 128 Cal.App.3d at pp. Supp. 5–6, fn. omitted.)

The majority, therefore, reversed Marotta's convictions.

The dissenting opinion, however, concluded the place of business exemption did not apply to a taxicab: "One of the main thrusts of [The Dangerous Weapons Control Law] is to restrict the carrying of loaded weapons and concealed weapons on the public streets. Any exceptions to this broad general purpose should be narrowly construed. [¶] . . . I believe that the Legislature had in mind businesses located in fixed geographical locations. While it is probably true enough, as the majority suggests, that this exception was designed to protect business property from robbers, it does not necessarily follow that such inherently 'mobile' enterprises as trucks, buses and taxies were meant to be included within this exception. If so, the exception would, to a large extent, emasculate the thrust of the legislation." (*People v. Marotta, supra*, 128 Cal.App.3d at p. Supp. 9 (dis. opn. of Jones, Acting P. J.).)

Two years later, the same appellate division faced a similar issue in *People v. Foley, supra*, 149 Cal.App.3d Supp. 33, which again involved convictions under sections 12025 and 12031 for carrying a concealed and loaded firearm in a vehicle. A police officer made a traffic stop after watching a Dodge van go through a stop sign. The defendant had two loaded handguns inside the van. He testified the van was registered with the Department of Motor Vehicles as a motor home and that, after losing his apartment, he had been living in the van which he parked behind his business. He testified the van was equipped with sleeping, bathing, and cooking facilities. In rebuttal, an officer testified he had examined the interior of the van and did not observe most of the appliances and furniture mentioned by the defendant. The trial court ruled that, even if Foley had actually been " 'temporarily residing in his vehicle behind his business during this period[,] . . . the fact of the matter is that he was . . . in transit,' " " 'he was in fact using it as a vehicle at the time . . . .' " (*People v. Foley*, at p. Supp. 40.)

On appeal, Foley cited *Marotta* in support of his argument the phrase "place of residence" as used in sections 12026 and 12031 "cannot be rationally interpreted to delineate a fixed geographic location." (*People v. Foley, supra*, 149 Cal.App.3d at p. Supp 38.) The appellate division explained: "In *Marotta* we held that 'place of business' included a taxicab. The very definition of 'taxicab' lends credence to such a holding. Webster's Third New International Dictionary (1971) at page 2345, defines 'taxicab' as follows: 'a chauffeur-driven automobile available on call to carry a passenger between any two points (as within a city) for a fare . . . .' In the instant case, defendant is urging our adopting a doctrine that interprets 'place of residence' as used in the relevant statutes before us to include motor homes, or house cars or vans. He proffers the position that the manner of design and equipment installed determines the issue, and not the use of the motor home, house car or van for transportation purposes on public streets; he presses that the controlling factor in determining whether the vehicle is or is not 'a place of residence' within the purview of the instant statutes rests upon whether the vehicle is utilized either permanently or partially as a place of dwelling." (*People v. Foley, supra*, 149 Cal.App.3d at p. Supp. 38.)

■ *Foley* rejected the defendant's argument: "Defendant's house car or van, as with any house car or van, has two essential functions: (1) to serve as a means of transportation or a motor vehicle whenever on a public street or public property or in transit, and (2) the capability to function as a 'home' or 'place of residence' when legally upon private property and being utilized as a 'place of residence.' In our day of ultra mobility, one may consider his jet airplane his 'place of residence' if he so desires, but when the plane is airborne, he is subject to FAA rules and regulations, just as he is subject to airport regulations when based at an airport; one may consider his yacht his 'place of residence,' but he is subject to maritime laws when upon the sea, and to harbor regulations when berthed; and one may consider his house car or van his home or 'place of residence,' but when he drives his car or van on the public streets or highways or causes said car or van to be thereupon while he is present, he is subject to arrest and successful prosecution for possession of concealed or loaded firearms should he be arrested with those items discovered in his car or van under circumstances similar to those before us. [¶] We hold that when in transit or upon a public street or thoroughfare, as in the instant case, a house car's driver violates Penal Code sections 12025 and 12031 when having within his vehicle, without a license to so carry, concealed or loaded firearms." (*People v. Foley, supra*, 149 Cal.App.3d at pp. Supp. 39–40.)

Contrary to Garber's assertion, there is no conflict between *Foley* and *Marotta*. As the People note, "*Foley* distinguished *Marotta* because there the taxicab *was* the driver's 'place of business.' " It is also significant that Judge

Bernstein, who concurred in the majority opinion in *Marotta*, joined the unanimous opinion in *Foley*.

The last case to address this issue was *People v. Wooten* (1985) 168 Cal.App.3d 168 [214 Cal.Rptr. 36], where the defendant claimed he was carrying concealed weapons on his person and in the cab of his pickup truck "for self-protection in the course of carrying on his business as a 'bounty hunter.' " (*Id.* at p. 172.) *Wooten* rejected the defendant's reliance on *Marotta*:

"We first note that *Marotta* is readily distinguishable. While taxicab drivers must do business in their cabs, bounty hunters do not. Their job is to get out of their car and arrest bail jumpers, not to run over them. The vehicle is simply a means to transport the bounty hunter. Unlike a taxi driver whose work cannot be done without a vehicle, bounty hunters may leave their own cars behind and use airplanes, buses, trains or taxis to pursue bail jumpers.

"Second, the reasoning of the *Marotta* court is not persuasive. The clear legislative purpose of section 12025 is to prohibit the carrying around of concealed weapons. Section 12026 provides an exception for possession in one's residence or place of business. The natural meaning of the term 'place of business' is a fixed location, simply because almost all businesses are conducted in some office, store or other building. When a business is mobile, one generally says that the business is not conducted in any particular place, but in an area. Giving Penal Code section 12026 the broad meaning advocated by defendant would render it meaningless. Salesmen, truck drivers, delivery persons—in short, anyone whose business puts them in transit—could use section 12026 to justify an exemption from section 12025. The obvious result would be that even convicted felons . . . could easily set themselves up as traveling salesmen and carry a concealed weapon in their car with impunity. This would frustrate the obvious legislative purpose of section 12025." (*People v. Wooten, supra,* 168 Cal.App.3d at p. 173.)

e. *Discussion.*

The People argue the foregoing case law demonstrates Garber was properly convicted because "the trial court and the Appellate Division both correctly concluded that, at all relevant times, petitioner's trailer was being used as a vehicle in a public place under sections 12025 and 12031, not as his 'place of residence' under sections 12026 and 12031, subdivision (l). . . . Under *Foley, Wooten,* and even the *Marotta* majority, he was using his trailer as a vehicle on public streets and areas, not as a 'place of residence.' "

In response, Garber argues none of the relevant cases has "held that the exemptions of [sections] 12026 and 12031, subdivision (l), do not apply to

one's mobilehome or trailer coach which is used *exclusively* as his or her place of residence." But Garber did *not* use his mobilehome exclusively as a place of residence. At the time of his encounter with Sorensen, he had been using his mobilehome as a means of transportation: he had driven it to Hjelte park in order to take his dog for a walk.

In another place, Garber refers to the trailer as "his exclusive, albeit mobile, dwelling place . . . ." Assuming the trailer was in fact the only place he lived, this characterization would be more accurate but not, ultimately, helpful to Garber because Foley, too, was presumed to have been living exclusively in his van.[4] The only difference between Foley's vehicle and Garber's vehicle is that the latter was a van/trailer combination, with the nonmotorized trailer hitched to the motorized van, while Foley just had a simple van. We cannot see why that should make any difference in the analysis.

The bounty hunter in *Wooten*, unlike the cab driver in *Marotta*, was not using his vehicle as his place of business. Garber, who was not using his vehicle as a place of residence when he drove to the park in order to walk his dog, is therefore like the defendant in *Wooten*, not the defendant in *Marotta*.

Garber argues that, because he sometimes used his trailer as a dwelling, he was entitled to a place of residence exemption since his trailer "would have retained its status as an inhabited dwelling, or 'place of residence,' for purposes of a first degree burglary prosecution had it been burglarized while parked at Hjelte Park, even if petitioner had not been inside." Garber is right about the burglary result,[5] but this analogy does not help his case. The aim of the burglary statute is to protect the vehicle's owner from the burglar's malicious entry; the aim of The Dangerous Weapons Control Law is to protect the public from the vehicle owner's easy access to a deadly weapon.

Hence, we agree with the People that, under the reasoning of *Foley*, *Wooten* and *Marotta*, the statutory place of residence exemptions did not apply in this case. At the time he committed these offenses, Garber was not using his mobilehome for residential purposes and, therefore, he was not entitled to have the jury instructed on a "place of residence" defense.

---

[4] *Foley* makes it clear the trial court predicated its holding on the assumption the defendant had been living only in his van. (*People v. Foley, supra*, 149 Cal.App.3d at p. Supp. 40.)

[5] See *People v. Aguilar* (2010) 181 Cal.App.4th 966, 970 [104 Cal.Rptr.3d 420] (habitability of dwelling for purposes of burglary statute "is viewed through the eyes of the person with the possessory right to the dwelling (i.e., the alleged victim of the burglary)"); *U.S. v. Lavender* (4th Cir. 1979) 602 F.2d 639, 641 (defendant properly convicted of breaking and entering because Winnebago was a dwelling even though it was parked while occupants had gone hiking).

[[ ]]*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The order to show cause is discharged. The five-year probationary term is hereby vacated and a three-year probationary term is substituted therefor. The clerk of the superior court is directed to prepare and forward to the Department of Corrections and Rehabilitation an amended abstract of judgment. In all other respects, Garber's habeas corpus petition is denied.

Kitching, J., and Aldrich, J., concurred.

On May 25, 2010, the opinion was modified to read as printed above. Petitioner's petitions for review by the Supreme Court were denied August 11, 2010, S183580. George, C. J., did not participate therein.

---

*See footnote, *ante*, page 724.