Filed 9/25/14  P. .v Wallace CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C070933 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F02912) |
| v. | |
| MARQUICE DEVON WALLACE, | |
| Defendant and Appellant. | |
| THE PEOPLE, | C070914 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F02912) |
| v. | |
| KALIEF RAHEEM TAYLOR et al., | |
| Defendants and Appellants. | |

1

Seventeen-year-old Marque Johnson was waiting for the bus at 7:00 a.m. on March 17, 2010, when three rival gang members, defendants Marquice Wallace, Kalief Taylor, and Robert Maurice (Reese) Hunt, shot and killed him. For this crime, a jury found Wallace guilty of first degree murder (Pen. Code, § 187),[1] with firearm enhancements (§ 12022.53 (b), (c), (d) & (e)(1)) and a gang enhancement (§ 186.22, subd. (b)(1)) and gang special circumstance (§ 190.2, subd. (a)(22)). A separate jury found Taylor guilty of second degree murder with gang and firearm enhancements. That same jury found Hunt guilty of first degree murder with firearm and gang enhancements, including that he personally discharged a firearm causing death, and a gang special circumstance.

For Wallace's other crimes in which he shot Taylor and later set fire to a memorial to Johnson, a jury found Wallace guilty of assault with a firearm (§ 245, subd. (a)(2)), with an enhancement for personal use of a firearm (§ 12022.5, subds. (a) & (d)), negligent discharge of a firearm (§ 246.3), and arson (§ 451, subd. (d)). Finally, separate from Johnson's murder, a jury found Taylor guilty of unlawfully carrying a loaded firearm (former § 12031, subd. (a)(2)(F)) with a gang enhancement.

The trial court sentenced all defendants to substantial prison terms: life without the possibility of parole, plus 25 years to life plus seven years eight months in prison for Wallace; 40 years to life plus five years for Taylor; and life without the possibility of parole plus 25 years to life for Hunt.

On appeal, defendants challenge the sufficiency of the evidence of their murder convictions and the admissibility of certain testimony of the gang expert. In addition, Wallace contends there was insufficient evidence he intentionally fired the gun to support the negligent discharge count, and that the trial court erred in failing to instruct on self-

---

[1] Further undesignated statutory references are to the Penal Code.

defense as to negligent discharge and assault. Taylor challenges the sufficiency of the evidence that he knowingly carried the firearm, and claims there were errors in sentencing and on the abstract. Hunt contends it was error (1) to admit Taylor's statements from a joint police interview, (2) to admit evidence of his and Taylor's exoneration of Wallace as rebuttal evidence, and (3) to further instruct on premeditation and deliberation after the jury announced its deadlock.

As we explain, we find insufficient evidence to support Wallace's conviction on count 2 (negligent discharge of a firearm) and Taylor's conviction on count 5 (carrying a loaded gun in a car). We reject the remainder of defendants' contentions, except Taylor's request to correct his abstract of judgment to reflect the proper enhancement. Except as noted, we shall affirm the judgments.

## FACTS

*Gang Rivalry*

Beginning in around 2000, gang families from Oakland moved to South Sacramento, many to Franklin Villa, known as G Parkway. The area had previously been run by the Crips gang. The Oakland gangsters took the name GMOBB and went to war with the Crips. GMOBB allowed local males to join under the GMOBB umbrella. The local group began as BAY (Bad-Assed Youngsters) and morphed into STARZ or STARZ Up. Another subset of the gang, composed of boys aged 14 to 16, was known as Guttah Boys. As time went by, some members of the Crips gang formed an alliance with STARZ.

GMOBB's rival is the Bloods gang and its various subsets, Ridezilla, FAB, and GUNZ or GUNZ Up, which started in 2007. The rivalry between GUNZ Up and STARZ Up/Guttah Boys became very violent. Between May 2008 and July 2010, law enforcement attributed 26 shootings as occurring between these two gangs.

*Wallace's March 8, 2010, Shooting of Taylor (Counts 1 & 2)*

On March 8, 2010, a woman who lived on Mack Road heard yelling. She looked out her window and saw a group of young African-American men yelling and running around; one had a gun in his hand. She called 911. She heard a shot; she saw a man fall and another kick him. The assailants fled.

A police officer was dispatched after the report of a fight. When he arrived, the fight was over. Taylor approached him and said he had been shot. Taylor was not cooperative or forthcoming with information about how the injury occurred. The officer observed a small entry wound on Taylor's shoulder and called the medics.

Mya Leggett, a trauma surgeon at Kaiser South, treated Taylor. He had a gunshot wound in his left shoulder and a bullet lodged in his chest. Taylor returned to the hospital approximately 10 days later to have the bullet removed. Dr. Leggett gave the bullet to the police. This bullet came from a different gun than the one later used to kill Johnson.

Samara Adams, who knew all three defendants, later told the police that Taylor came to her apartment after he left the hospital. He told her that Wallace had shot him. Separately, Wallace admitted to Samara that he had shot Taylor.[2]

At trial, the gang expert testified this shooting was part of an altercation between STARZ Up and the rival Oak Park Bloods. The report of the incident indicated that Wallace and Taylor were being assaulted when the shooting occurred.

In his interview with the police (played only to his jury), Wallace at first denied shooting Taylor. Later, he said Taylor gave him the gun. They were confronted by a

---

[2] At trial, Samara admitted she was familiar with the situation in which Wallace shot Taylor. She remembered Taylor coming to her apartment in his hospital gown, but she claimed not to remember telling the police that Taylor said Wallace shot him or that Wallace admitted the shooting.

group from Oak Park who hit Taylor, so Wallace pulled out the gun and it accidentally discharged. He was not aiming at or trying to shoot anyone.

*March 10, 2010, Shooting (No Counts)*

On March 10, 2010, Julian Williams was shot at Mack Road and Center Parkway. The suspected shooter was Isaiah Hale. When Hale was taken into custody at the Aspen Apartments, Taylor was present. An officer investigating the shooting saw a young Hispanic male, Luis Alcazar, enter the apartments. Alcazar left two minutes later; he was walking awkwardly and wearing a big sweatshirt that appeared to have something under it. Alcazar testified Hunt told him to retrieve a gun thrown from the window when Hale was arrested. He told the police that on the day of Johnson's murder, Hunt had a black .380 gun, the same gun Alcazar had retrieved the day Hale was arrested. One of the bullets that hit Johnson was fired from the same gun as the bullet that struck Williams.

It was stipulated that Hunt, Taylor, and Wallace were never suspects in the shooting of Williams.

*Taco Bell Incident (No Counts)*

There was an altercation at a Taco Bell Restaurant on Mack Road about March 15, 2010. A group of three males were eating their food when a larger group of eight or nine, who did not frequent that Taco Bell, came in and it got "rowdy." The three eating their food tried to avoid a confrontation. A man with long braids was the rowdiest. The altercation lasted 10 minutes; the manager asked them to leave, pointed out the cameras, and threatened to call the police. The manager identified photographs of some of the participants, who were gang members. The "rowdiest" was Tony Morgan, a validated 29th Street Crip, one of the Crip cliques that has alliances with STARZ Up and GMOBB. The manager was unsure if Hunt was there, and said Wallace was "possibly" there.

Wallace told the police he and Hunt, and possibly Taylor, were at the Taco Bell. "We was [*sic*] all talking shit." Wallace thought the people they were arguing with were

5

from the Valley High Pirros gang; he was not quite sure. The gang expert opined this altercation was between the rival gangs GUNZ and STARZ.

*Murder of Marque Johnson (Count 3)*

Stephen McDowell, then age 14, lived at the Aspen Apartments at Mack Road and Summersdale with his mother. The morning of March 17, he was walking to catch the bus on Mack Road to school. Three African-American men walked past. One asked for a dollar and another for a condom. McDowell said no. The men went around the corner and McDowell heard three gunshots. The three men were in their 20's and had dreadlocks. One was lighter skinned and wore a blue jacket; the others were darker.

Charity Martin also lived at the Aspen Apartments and was getting ready for school. As she walked out her door, she heard three or four gunshots. She stepped out and looked left. She saw two young men in hoodies or black jackets peeking around the building towards Summersdale. It looked like they were hiding a weapon. One said, "[I]s he still down? If he's not down, we could do some more." She tentatively identified Taylor as one of these two men. She walked out of the apartment and saw a young man on the ground.

Also hearing the shots were Christy Adams and her daughter Samara, who lived at the Aspen Apartments. Samara looked out the window and saw Taylor and two friends running. Taylor knocked on the window and she let all three defendants in. They saw a report of the shooting on television and one of defendants recorded it on his cell phone.

Luis Alcazar, the teen who retrieved the gun after the Williams shooting, was at the Adams's apartment that morning. He testified at trial that Taylor came first alone and Hunt and Wallace followed a minute later. Hunt and Wallace looked like they had been running. Hunt had a black .380 gun and Wallace had a chrome gun. It looked to Alcazar as though Taylor had two guns in his back pocket. Defendants wrapped the guns in a T-shirt and gave them to Alcazar to hide in the boiler room. Later, Taylor took the guns when he left.

When the police arrived, 17-year-old Marque Johnson was down but still breathing. Johnson had two gunshot wounds, one to his chest and the second to his lower left leg. He died from the gunshot wound to the chest. The police found three spent .380 shell casings at the scene.

*Taylor's Possession of a Loaded Gun (Count 5)*

As part of the murder investigation, a gang detective was assigned to conduct surveillance of a white Oldsmobile on March 19. He followed the car to a McDonald's Restaurant on Mack Road and Valley High. The driver was Douglas Livingston, a known STARZ Up member, and Taylor was the front passenger. There were two female passengers in the rear. The detective moved in front of the Oldsmobile and directed marked police cars behind it to activate their lights and sirens. The Oldsmobile then passed the detective's car. The Oldsmobile approached the curb and drove "right along the curb line of Florin Road." It then turned into the entrance to the light rail, attempting to evade the marked units, but the marked units caught up and stopped the car. During the time that the car was driving along the right curb line, the detective had a better view of the driver's side than he did of the passenger side, and he did not see the driver's arm come out of the car. He testified (with no objection imposed) that had the driver's arm come out of the window or had the driver even made a gesture, he (the detective) would have seen it.

Officers searched the area immediately adjacent to the stretch of Florin Road where the car had hugged the right curb, travelling onto the shoulder. They found a loaded .44 revolver about 20 to 30 feet from where the passenger side of the car had been. The handle of the gun was damaged or missing and there were "fresh scrapes" on the cylinder. None of the occupants of the car was the registered owner of the gun.

7

*Arson (Count 4)*

After Johnson's murder, a memorial to him was erected on Summersdale Drive, consisting of pictures, candles, flowers, and stuffed animals. On March 19, 2010, there was a small fire at the memorial. A fire fighter easily put it out.

Samara told the police that Wallace told her he spit on the memorial and lit a fire. He came and got her to show her the fire. He told her he "didn't like the boy" because he was GUNZ. Wallace yelled something disrespectful; afterwards he was nervous.[3]

In his interview with the police (played only to his jury), Wallace said he spat on pictures at the memorial and urinated close to it. He said someone else set the fire.

*Gang Expert*

Detective Scott MacLafferty testified as an expert in African-American street gangs within the Sacramento area. He detailed the history of GMOBB and its subsets STARZ Up and Guttah Boys, and the rivalry with GUNZ Up. He testified Hunt was a validated STARZ and GMOBB member. In his opinion, Taylor was a STARZ Up gang member. Taylor had admitted his membership. Wallace was not a validated STARZ member, but was a member of the organization under the Guttah Boys. MacLafferty had previously interviewed the victim Johnson. Johnson was a member of GUNZ Up, but MacLafferty did not know if Johnson had ever "put [] in work" for the gang by committing crimes.

In MacLafferty's opinion, the killing of Johnson was gang related. He explained that in the gang context the most important thing was the concept of respect. It was a forced respect based on fear and intimidation. Gang members spread fear by committing crimes against each other. The crimes are very violent and often occur quickly. Gang members prepare themselves for this violence by always being with others and making

---

[3] At trial, Samara did not recall telling the police any of this.

sure at least one in the group has a gun. A gang member did not want to get caught "slippin'," that is, alone and without a gun. MacLafferty believed that Johnson had been caught "slippin'." The investigation of the Johnson murder found no motive for the killing other than gang rivalry.

MacLafferty discussed the group dynamic factor in gang-related crimes. Almost all these crimes involved multiple people. The group dynamic impacted the likelihood that a crime would occur. The prosecutor posed a hypothetical of three STARZ members walking around armed before 7:00 a.m. on a Wednesday, and asked if that was an example of gang members prepared and looking for an opportunity to attack a rival. MacLafferty said yes.

MacLafferty believed the other charged crimes were also gang related. The fire at the memorial was a form of disrespect, intended to increase the level of fear and intimidation. Wallace's shooting of Taylor was gang related because it was part of an altercation between STARZ Up and the rival Oak Park Bloods. Taylor's throwing the gun from the car was gang related because gun possession was a primary activity of STARZ Up.

*Wallace Interview*

Wallace's interview with the police was played only to his jury. Wallace admitted he was present at Johnson's shooting. Taylor had called him and Hunt that morning around 6:30 a.m. to meet on Mack Road at the doughnut shop. Defendants first asked a kid for a condom and a dollar. They then asked Johnson for some marijuana and he responded, "fuck no." Wallace claimed Hunt argued with Johnson, shot him, and then hid the gun.

*Hunt and Taylor Joint Interview*

The police conducted a joint interview with Hunt and Taylor, parts of which were played only to their jury. Taylor claimed the argument was between Johnson and Wallace. Both Hunt and Taylor claimed they were on the phone during the argument and

9

didn't know anything about the shooting. After the People had rested their case, and both defendants had also rested, the People called Detective Heinlein to testify that in the joint interview both Taylor and Hunt said "no" when asked if Wallace was the shooter. Hunt then added that he only said "no" because Taylor said "no."

## DISCUSSION

### I

### *Wallace's Contentions*

A. *Insufficient Evidence of Aiding and Abetting Premeditated Murder*

The People's theory of the case was that defendants were out the morning of the killing looking for a rival gang member who was "slipping" and Johnson fit the bill. Defendants decided to kill that morning when they left their homes with guns. The prosecutor compared defendants to deer hunters, looking for prey.

The jury found Wallace guilty of first degree murder. He contends there was insufficient evidence that he aided and abetted premeditated murder. He further contends the People failed to identify an act constituting aiding and abetting, and they cannot rely solely on his presence at the scene of the crime, his failure to stop the crime, and his gang affiliation. He argues there was no evidence of a premeditated murder; the evidence showed, "at best, an opportunistic killing."

#### 1. Standard of Review

The standard for judicial review of a criminal conviction challenged as lacking evidentiary support is well established: "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) We accord due deference to the verdict and will not substitute our conclusions for those of the trier of fact. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078 (*Koontz*).) A conviction will not be reversed for

10

insufficient evidence unless it appears " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

### 2. Aiding and Abetting

"To prove that a defendant is an accomplice, . . . the prosecution must show that the defendant acted 'with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' [Citation.]" (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.) "When the offense charged is a specific intent crime, the accomplice must 'share the specific intent of the perpetrator'; this occurs when the accomplice 'knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime.' [Citation.] . . . [A]n aider and abettor is a person who, 'acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.' [Citation.]" (*Ibid*.)

"Among the factors which may be considered in determining aiding and abetting are: presence at the crime scene, companionship, and conduct before and after the offense." (*In re Juan G.* (2003) 112 Cal.App.4th 1, 5.) "In addition, flight is one of the factors which is relevant in determining consciousness of guilt. [Citation.]" (*In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1095.)

There is sufficient evidence of aiding and abetting murder considering the *In re Juan G.* factors. Wallace admitted Johnson was one of the rival gang members they had encountered at Taco Bell two days before the murder. Wallace further admitted he was "really hella mad" that night because one of the rivals had jumped his little brother. Wallace met Hunt and Taylor at the doughnut shop the morning of the killing. He was armed and accompanied the other defendants to the scene of the crime. They were

11

friends--Wallace referred to Hunt as his best friend. Further, their companionship was strengthened by their gang ties. Wallace admitted he quarreled with Johnson immediately prior to the shooting. After the murder, he ran away with the others and sought refuge with them in Samara's apartment. He did not leave separately or otherwise disassociate himself from their actions. At Samara's, one of the group recorded the television report of the shooting. From this evidence the jury could infer that Wallace knew of the plan to kill a rival gang member and intended to facilitate or encourage it.

Alcazar testified that Taylor arrived first at Samara's, and thus the jury could have concluded that Wallace was one of the two men that Martin saw peek around the corner and discuss whether Johnson was down or should be shot again, evidence that Wallace shared the intent to murder Johnson. Further, Wallace urinated on Johnson's memorial, set it on fire, and made a derogatory remark. He told Samara he "didn't like the boy" because he was GUNZ, providing the motive for the murder.

Here the evidence of aiding and abetting is stronger than that found sufficient in *In re Juan G.* There, the minor approached the robbery victim with the perpetrator, stood close to the perpetrator when the demand for money was made, intimidating the victim, and fled with the perpetrator. (*In re Juan G., supra,* 112 Cal.App.4th at p. 5.) Defendant's conviction for aiding and abetting a robbery was also upheld in *Lynette G., supra,* 54 Cal.App.3d at page 1095, where the minor was with the actual robber during the robbery and fled with her afterwards.

Wallace relies on a number of Ninth Circuit cases for the proposition that, "Membership in a gang cannot serve as proof of intent, or of the facilitation, advice, aid, promotion, encouragement or instigation needed to establish aiding and abetting." (*Mitchell v. Prunty* (9th Cir. 1997) 107 F.3d 1337, 1342 (*Mitchell*), overruled in part on another point in *Santamaria v. Horsley* (9th Cir. 1998) 133 F.3d 1242, 1248.) We have no quarrel with the general proposition, but find the cases Wallace cites are distinguishable. While Wallace's gang affiliation was a significant fact in the evidence

12

supporting a finding he was an aider and abettor, unlike in the cases he cites, it was far from the sole evidence of his involvement.

For example, in *Mitchell*, defendant and his cohorts were involved in a dispute with a rival gang that led to two shootings; when they fled, one car made a U-turn and ran over Jerry "Judabean" Knox, killing him. (*Mitchell, supra,* 107 F.3d at p. 1338.) A divided panel found insufficient evidence defendant was guilty of second degree murder, which was caused by driving over the victim, not the shots, where the jury expressly found defendant did not drive the car. The majority found no evidence as to defendant's role in the killing. "There is no proof that the vehicle that killed Judabean was owned or provided by Mitchell for the purpose of doing the running over; there is no proof that Mitchell said anything to the driver of the vehicle in the minutes between the shooting and the fatal U-turn; in short, there is nothing at all to suggest that Mitchell helped bring about Judabean's death, except perhaps by adding weight to the car that ran over Judabean's body. There is, in other words, a massive failure of proof that Mitchell aided and abetted Judabean's killing." (*Mitchell, supra,* 107 F.3d at p. 1342.) Here, in contrast, as we described *ante,* there is more than sufficient evidence of aiding and abetting, given the events leading up to the shooting as well as Wallace's conduct after the shooting.

### 3. First Degree Murder

"A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.] 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . ." [Citations.]' [Citation.]" (*Koontz, supra,* 27 Cal.4th at p. 1080.)

13

"We normally consider three kinds of evidence to determine whether a finding of premeditation and deliberation is adequately supported--preexisting motive, planning activity, and manner of killing--but '[t]hese factors need not be present in any particular combination to find substantial evidence of premeditation and deliberation.' [Citation.] If the evidence of preexisting motive and planning activity by itself is sufficient to support the first degree murder conviction on a theory of premeditation and deliberation, we need not review the evidence concerning the manner of killing. [Citation.]" (*People v. Jennings* (2010) 50 Cal.4th 616, 645-646 (*Jennings*).) "A first degree murder conviction will be upheld when there is extremely strong evidence of planning, or when there is evidence of motive with evidence of either planning or manner. [Citations.]" (*People v. Romero* (2008) 44 Cal.4th 386, 401 (*Romero*).)

Here there was sufficient evidence of first degree murder based on evidence of motive, planning, and manner of killing. The evidence of motive was strong. The gang rivalry between STARZ and GUNZ was particularly intense at the time. There had been 26 shootings in a two-year period, and the Taco Bell incident just days before intensified the rivalry. Wallace admitted he and Hunt recognized Johnson and knew he was a rival. The strength of the gang motive is also shown by Wallace's actions and statements at Johnson's memorial. The gang motive provides strong evidence of premeditation and deliberation. "A studied hatred and enmity, including a preplanned, purposeful resolve to shoot anyone in a certain neighborhood wearing a certain color, evidences the most cold-blooded, most calculated, most culpable, kind of premeditation and deliberation." (*People v. Rand* (1995) 37 Cal.App.4th 999, 1001.)

In addition to strong evidence of motive, there was evidence of planning and the manner of killing. Defendants met very early at the doughnut shop that morning and Wallace, as well as Hunt and possibly Taylor, was armed. *(People v. Lee* (2011) 51 Cal.4th 620, 636 [that defendant brought a firearm showed he considered the possibility of a violent encounter].) After the shooting, all defendants fled to the same

14

place, Samara's apartment, which the jury could consider a prearranged plan.  Johnson was shot in both the chest and the leg.  Multiple gunshot wounds inflicted on an unarmed and defenseless victim who posed no immediate threat to defendant supports a conviction of first degree murder.  (*People v. Silva* (2001) 25 Cal.4th 345, 369.)

B.  *Failure to Instruct Sua Sponte on Self-Defense on Counts 1 and 2*

Wallace contends the trial court erred in failing to instruct sua sponte on self-defense as to counts 1 and 2, assault on Taylor and negligent discharge of a firearm.  Wallace and Taylor's statements to Samara provided evidence that Wallace shot Taylor, but the only evidence as to *how* the shooting occurred came from Wallace's statement to the police.  Wallace contends this evidence was sufficient to support a claim of self-defense.  Wallace told the police Taylor gave him a gun; when a rival group confronted them and hit Taylor, Taylor told Wallace to "pull it out."  When Wallace did, the gun "just goes off."  Wallace denied he was trying to shoot anyone.

" 'In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case.'  [Citation.]  That duty extends to ' "instructions on the defendant's theory of the case, including instructions as to defenses" ' that the defendant is relying on . . ., or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' " ' " ' "  (*People v. Anderson* (2011) 51 Cal.4th 989, 996.)

"[T]raditional self-defense imports an intentional shooting; it does not apply to an accidental one."  (*People v. Curtis* (1994) 30 Cal.App.4th 1337, 1357.)  Thus "[i]t appears to be decided that an accidental shooting is inconsistent with an assertion of self-defense.  [Citations.]"  (*People v. Villanueva* (2008) 169 Cal.App.4th 41, 50.)  In California, where a defendant claims the shooting was by accident, even while defending himself, he is not entitled to an instruction on self-defense.  (*Curtis, supra,* 30 Cal.App.4th at p. 1358.)  The law requires intentional discharge of the gun.

15

Wallace contends this rule is inconsistent with *People v. Barton* (1995) 12 Cal.4th 186 (*Barton*). In *Barton*, defendant testified he shot the victim by accident during an argument over a road rage incident involving defendant's daughter. (*Id*. at pp. 192-193.) Over a defense objection, the trial court instructed the jury on voluntary manslaughter, and our Supreme Court upheld giving the instruction. (*Id*. at p. 201.) The court reasoned the jury could disbelieve defendant's self-serving testimony that the gun's discharge was accidental and look to the evidence to determine the level of homicide. (*Id*. at pp. 202-203.)

*Barton* does not aid Wallace because it addressed the court's responsibility to instruct sua sponte on *lesser offenses*, not *defenses*. The trial court has a duty to instruct sua sponte on lesser included offenses when substantial evidence supports a verdict on *only* a lesser offense than that charged, even over defendant's objection. (*Barton, supra,* 12 Cal.4th at pp. 194-195.) " 'Just as the People have no legitimate interest in obtaining a conviction of a greater offense than that established by the evidence, a defendant has no right to an acquittal when that evidence is sufficient to establish a lesser included offense.' [Citation.]" (*Id*. at p. 195.) In contrast, the trial court's duty to instruct sua sponte on *defenses* "is more limited, arising 'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' [Citations.]" (*Ibid.*) Because self-defense was inconsistent with Wallace's defense of accidental shooting--rather than an intentional shooting wherein he accidentally shot someone at whom he did not aim--the trial court had no duty to instruct sua sponte on that defense.

C. *Insufficient Evidence that Wallace Intentionally Fired the Gun (Count 2)*

Negligent discharge of a firearm, section 246.3, requires that the defendant intentionally fire the weapon. (*In re Jerry R.* (1994) 29 Cal.App.4th 1432, 1438-1439.) Wallace contends there is insufficient evidence that he intentionally fired the gun, as the

only evidence on this point was his statement that the gun accidentally discharged.  We agree that the evidence is insufficient.

"Settled principals of appellate review require us to review the entire record in the light most favorable to the judgment below to determine whether it discloses substantial evidence--that is, evidence which is reasonable, credible, and of solid value--from which a reasonable trier of fact could find" that Wallace intentionally fired the gun.  (*People v. Perez* (1992) 2 Cal.4th 1117, 1124)  As Wallace recognizes, the jury was not required to accept his self-serving statements about how the shooting occurred.  However, absent his statements regarding the shooting, there was not sufficient evidence for the jury to determine *how* the shooting occurred, let alone that Wallace *intentionally* fired the gun.

Absent Wallace's statement, the People's evidence regarding the circumstances surrounding the shooting showed only that a witness had looked out her window and had seen a group of young African-American men yelling and running around, one with a gun in his hand.  She heard a shot and saw a man fall, but did not see the shooting.  This was the only other evidence introduced outside of Wallace's statement which even arguably spoke to his intent, and it said little.  The woman did not identify any of the men, nor did she see the shooting.  The People do not even cite to this evidence in their briefing in support of their argument--remarkably, they cite *no* evidence in support of their argument that the evidence of intent was sufficient.  They baldly write that "the jury was entitled to conclude that the most reasonable interpretation of the evidence was that [Wallace] intentionally pulled the trigger" and cite to the jury instructions regarding circumstantial evidence, but do not indicate what evidence, whether direct or circumstantial, we should be reviewing.  Nor do they explain how from that evidence we could hold the jury "reasonably interpreted" evidence of Wallace's intent.  That evidence which we have

17

located is not sufficient to sustain Wallace's conviction for intentionally firing his gun, resulting in Taylor's shooting. We must reverse count 2.**4**

D. *Improper Gang Expert Testimony--Failure to Use Hypotheticals*

Wallace contends the trial court erred in admitting expert gang testimony that all the charged crimes were gang related, without requiring that the gang expert couch his opinions as responses to hypothetical questions. Wallace contends MacLafferty's testimony was in effect that " 'the gang allegations in this case are true.' "

"California law permits a person with 'special knowledge, skill, experience, training, or education' in a particular field to qualify as an expert witness (Evid. Code, § 720) and to give testimony in the form of an opinion (*id*., § 801). Under Evidence Code section 801, expert opinion testimony is admissible only if the subject matter of the testimony is 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' (*Id*., at subd. (a).) The subject matter of the culture and habits of criminal street gangs . . . meets this criterion." (*People v. Gardeley* (1996) 14 Cal.4th 605, 617.)

In *People v. Vang* (2011) 52 Cal.4th 1038 (*Vang*) at page 1045, our Supreme Court approved the use of hypothetical questions that tracked the evidence, even if only " 'thinly disguised,' " as to whether the crime was gang-related activity. The high court did not decide whether it was improper for an expert to testify whether specific defendants acted for a gang-related reason. (*Id.* at p. 1048 & fn. 4.) The court noted, however, that to the extent such testimony was improper, "the reason for this rule is *not* that such testimony might embrace the ultimate issue in the case. 'Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact.' [Citations.] Rather, the reason for the

---

**4** Wallace does not challenge his conviction on count 1, assault on Taylor based on the same shooting.

rule is similar to the reason expert testimony regarding the defendant's guilt in general is improper. 'A witness may not express an opinion on a defendant's guilt. [Citations.] The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue. [Citations.] "Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt." ' [Citations.]" (*Id*. at p. 1048.)

At least one court has found the admission of an expert witness's opinion that the crimes of the particular defendants in question were committed for the benefit of the respective defendants' gangs, without the use of a hypothetical, was within the trial court's discretion. (*People v. Valdez* (1997) 58 Cal.App.4th 494, 509.) Our Supreme Court approvingly cited *Valdez* for this very point in *People v. Prince* (2007) 40 Cal.4th 1179 at page 1227 (*Prince*). Likewise, the court in *Vang*, albeit in dicta, expressed support for that holding: "It appears that in some circumstances, expert testimony regarding the specific defendants might be proper. [Citations.]" (*Vang, supra,* 52 Cal.4th at p. 1048, fn. 4.)

Here, the People clearly failed to pose their questions to Detective MacLafferty in the form of hypotheticals grounded in the facts of the case. Wallace, however, failed to object to the form of the question. Failure to object to a gang expert's testimony at trial forfeits any contention regarding that testimony on appeal. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 818-819; Evid. Code, § 453.) Moreover, had counsel objected, the People would have reframed the question, reciting the evidence set forth in the expert's answer as the hypothetical facts of the question. The same evidence would have been called to the jury's attention and the same expert opinion that such evidence showed a gang-related crime would have been presented. Accordingly, we find no prejudicial error in the failure to use hypothetical questions to elicit the gang expert's opinions as to whether the crimes were gang-related activity.

19

E. *Improper Gang Expert Testimony--Group Dynamic*

Wallace contends the trial court erred in permitting MacLafferty to testify about the effect of the group dynamic on gang behavior. MacLafferty testified gang members are always prepared for violence by being with others and making sure at least one has a gun. For a gang member, it is important to know whether one's group and those it encounters are armed. Someone caught unarmed is "slippin' " and the response will be different; Johnson was caught "slippin'." The group dynamic increases the likelihood of the crime occurring. Wallace contends this testimony violated "the admonition in *People v. Killebrew* (2002) 103 Cal.App.4th 644 [*Killebrew*], that an expert cannot testify to a specific defendant's intent."

Before trial, Taylor filed an in limine motion to exclude this gang expert testimony and Wallace joined. The primary concern, shared by the trial court, was that the expert's testimony would suggest that presence at the scene alone was sufficient to establish aiding and abetting.[5] The trial court ruled the expert could testify that the likelihood of a criminal street gang engaging in criminal conduct is increased when more than one gang member is present. The court found such testimony did not necessarily implicate any specific individual nor did it "offend the premise" that presence at the scene of the crime is insufficient for aiding and abetting. The court noted the probability of a crime being committed is often greater when those who share the intent are present. This was true not just for gang members, but also those who are "egged on by his roommates or boyfriend or girlfriend."

"The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the

---

[5] The court instructed the jury that presence alone is insufficient to establish aiding and abetting.

20

standard for admissibility is subject to review for abuse of discretion. [Citations.]" (*People v. McDowell* (2012) 54 Cal.4th 395, 426.) We find no abuse of discretion here.

It is established that a gang expert can testify as to gang culture, habits, and psychology (*People v. Garcia* (2007) 153 Cal.App.4th 1499, 1512), gang practices (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 ()), and what gang members typically expect (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1371 (*Olguin*)).

In *Killebrew*, *supra*, 103 Cal.App.4th at page 652, disapproved on another point in *Vang, supra,* 52 Cal.4th at page 1047, footnote 3, the gang expert "testified that when one gang member in a car possesses a gun, every other gang member in the car knows of the gun and will constructively possess the gun." The court found this testimony was an opinion on the subjective knowledge and intent of each occupant of the car and improperly admitted. (*Killebrew, supra,* 103 Cal.App.4th at p. 658.) The *Killebrew* court distinguished this testimony from that about the *expectations* of gang members. "Testimony that a gang would expect retaliation as a result of a shooting such as occurred at Casa Loma Park, that gangs would travel in large groups if expecting trouble, that in a confrontation more than one gang member may share a gun in some identified circumstances, and that oftentimes gang members traveling together may know if one of their group is armed, would have been admissible." (*Ibid*.)

Detective MacLafferty's testimony fell within this permissible scope of testimony about gang expectations. His testimony can only be read as discussing the usual practice and expectations of any and all gang members, not as declaring the knowledge and intent of defendants. After all, he also discussed the concept of "slippin'," which applied to the victim only, who, despite his gang affiliation, was alone and unarmed.

Moreover, in *Killebrew*, the gang expert's testimony was the only evidence offered to establish the elements of the crime. (*Killebrew, supra,* 103 Cal.App.4th at p. 658.) Here, by contrast, there was other evidence to establish Wallace's role in the killing, as detailed *ante*.

21

To the extent Wallace's contention focuses on MacLafferty's discussion of the group dynamic, we find the contention unavailing. That young men may act differently when in a group with their peers than they would alone appears, as the trial court noted, to be common experience. While such testimony is not beyond the common experience of jurors (Evid. Code, § 801, subd. (a)), "experts may testify even when jurors are not 'wholly ignorant' about the subject of the testimony." (*Prince, supra,* 40 Cal.4th at p. 1222.) Although we do not find the overlay of MacLafferty's experience regarding group dynamics in the context of gang violence particularly illuminating on the subject of group dynamics, his testimony certainly cannot be said to have prejudiced defendants merely because it overlapped with an area within most jurors' common experience. Although it was of little worth, its admission did not constitute abuse of discretion.

## II

### *Taylor's Contentions*

#### A. *Insufficient Evidence of Aiding and Abetting Murder*

In closing argument before the Taylor and Hunt jury, the People asserted that Hunt was the shooter and that Taylor was an aider and abettor; he knew Hunt's unlawful purpose based on his gang lifestyle and that as a group the gang was always looking for opportunities to attack a rival. Taylor contends there is insufficient evidence he aided and abetted the murder. He contends there is no evidentiary support for the People's argument that Taylor knew of Hunt's plan. He argues the People improperly leaped from the general information about gangs provided by the gang expert to Taylor's specific knowledge.

We discussed the law of aiding and abetting *ante* at Part IA when discussing Wallace's identical claim. Applying the analysis consistent with that law, it is clear that substantial evidence supports a jury finding that Taylor also aided and abetted Johnson's murder. He was with the shooter (Hunt) immediately before the murder, at the meeting at the doughnut shop, and fled with the others after the murder to Samara's apartment,

22

where he stayed for some time with Hunt and Wallace, watching their exploits on the news and making a recording. His companionship with Hunt was established by their gang affiliation. Further, Hunt's statement to the police provided some evidence that Taylor was involved in the dispute with Johnson before the shooting.

Significantly, Martin tentatively identified Taylor as one of the two men she saw after the shooting, peeking around the building and discussing whether Johnson was down or should be shot again. This was evidence that Taylor was aiding and abetting the murder. While Alcazar testified that Taylor arrived first at the apartment and that Hunt and Wallace followed, suggesting the two men peeking were Wallace and Hunt, Martin not only tentatively identified Taylor, but also described the two men as wearing "black jackets." There was evidence that Hunt and Taylor were dark skinned and wore black, while Wallace was lighter and wore a blue jacket.

Finally, Taylor's actions in cleaning and securing the guns support a finding he aided and abetted the murder. Taylor put alcohol on a T-shirt and wrapped the guns in it. He first gave the guns to Alcazar to hide. When he left Samara's apartment, Taylor took the guns with him.

B. *Insufficient Evidence Taylor Unlawfully Carried a Loaded Firearm (Count 5)*

Taylor contends there is insufficient evidence to support his conviction on count 5, carrying a loaded firearm, because there was no evidence that he carried a gun or knew of its presence. We agree the evidence was insufficient as to this count.

We refer to our discussion of the applicable law regarding sufficiency of the evidence *ante* in Part IC. To prove a violation of former section 12031, subdivision (a), the People must prove defendant carried a loaded firearm in a vehicle; defendant knew he was carrying a loaded firearm; and at the time, defendant was in a public place or on a public street. (See *Garber v. Superior Court* (2010) 184 Cal.App.4th 724, 732; see also CALCRIM No. 2530.)

23

Taylor first contends there was no evidence that the gun came from the Oldsmobile in which he was riding, and then argues that there was insufficient evidence tying him to the gun. Because we agree with his second point, we need not address his first point in detail. Even assuming that the evidence of the car's actions in pulling to the right shoulder and slowing, followed by the discovery of the gun bearing "fresh" damage, was sufficient to prove the gun was thrown from the car, the evidence that it was Taylor who threw the gun from the car is lacking. The car had four people in it, and two were on the passenger side. The detective testified only that he did not see the *driver* throw anything out of the car during the relevant time period. No witnesses testified as to what occurred inside the car, and no witnesses testified regarding the actions of the remaining three occupants of the car. There was no evidence that Taylor had possessed a gun immediately before he got into the car or while he was in the car. There was no evidence at all linking Taylor to the gun, at any time. Although the People argue that the "scenario" where Taylor threw the gun from the car was more "plausible" than other scenarios, such as one of the other passengers throwing the gun, plausibility is not the test. (*People v. Harvey* (1984) 163 Cal.App.3d 90, 105, fn. 7 ["Substantial evidence means more than simply one of several plausible explanations for an ambiguous event"].) Nor is the fact that Taylor and the driver were gang members sufficient to show that Taylor possessed the gun and threw it out of the car, where there were multiple people in the car and no witnesses as to how the gun came to be on the sidewalk. Thus the evidence is insufficient and we must reverse count 5.

C. *Proper Sentence for Second Degree Murder*

It is clear the trial court intended a sentence of 15 years to life on count 3, the murder count, as it stated the aggregate term was 40 years to life plus five years, which included the 25 years to life firearm enhancement and the two-year term and three-year enhancement on count 5. The trial court, however, misspoke in sentencing Taylor on count 3 and classified the sentence as "25 years to life." The parties agree the correct

sentence for second degree murder is 15 years to life. (§ 190, subd. (a).) The minute order and the abstract of judgment both reflect the correct sentence of 15 years to life on count 3, so no correction is necessary.

D. *Correction of Abstract*

Taylor requests that his abstract of judgment be corrected to reflect the firearm enhancement imposed on count 3 was pursuant to section 12022.53, subdivisions (d) *and (e)(1)*, not just (d) alone. Taylor is correct and the People agree the abstract should be corrected. We will direct the trial court to correct Taylor's abstract of judgment to show the proper firearm enhancement pursuant to section 12022.53, subdivisions (d) and (e)(1). (See *People v. Ngaue* (1992) 8 Cal.App.4th 896, 899, fn. 3 [correcting abstract due to error in enhancement].)

Finally, Taylor joins in all issues raised by Hunt that would affect his judgment. We turn now to those contentions.

III

*Hunt's Contentions*

A. *Insufficient Evidence of Premeditation and Deliberation*

Hunt contends there was insufficient evidence of premeditation and deliberation. He argues there was no evidence of planning; the manner of killing was ambiguous (because one of three shots did not hit Johnson); and the motive alone--gang rivalry-- explained why Hunt was armed and supported the "hasty and impetuous" nature of the killing.

For the same reasons that we rejected Wallace's similar argument *ante*, we reject Hunt's. There was sufficient evidence from which the jury could find first degree murder. The evidence of gang rivalry as defendants' motive to kill Johnson was very strong. Hunt was armed and fired multiple shots at an unarmed victim. He then discussed whether Johnson was "still down" or should be shot again. Defendants

25

gathered before the shooting, were together when they found and shot Johnson, and fled to the same place after the killing, indicative of planning and follow-through.

Hunt relies on *People v. Dillon* (1983) 34 Cal.3d 441 (*Dillon*), where a first degree felony murder conviction was reduced to second degree. In *Dillon*, a juvenile and several classmates were attempting to steal marijuana from a farm when a classmate's gun twice accidentally discharged and the juvenile was confronted by the farmer, who had a shotgun and had previously threatened to shoot the boys. (*Id*. at pp. 451-452.) The juvenile quickly fired several shots, killing the farmer. (*Id*. at p. 452.) In finding a life sentence cruel and unusual, the court noted, "The shooting in this case was a response to a suddenly developing situation that defendant perceived as putting his life in immediate danger." (*Id*. at p. 488.) Here, in sharp contrast, there was no evidence that Johnson posed any immediate danger to Hunt and his companions. This killing was not a hasty response to a quickly developing and life-threatening situation, but the planned killing of an unarmed rival.

B. *Admission of Taylor's Statements in Joint Interview*

Hunt contends the trial court erred in admitting into evidence, over objection, statements made by Taylor in the joint interview with the police. He contends Taylor's statements contradicted and challenged his version of events. He contends the trial court erred in finding these statements were either adoptive admissions or simply provided context.

1. Background

The police jointly interviewed Hunt and Taylor. Hunt moved for a separate jury and to exclude Taylor's statements. He argued each defendant's statements implicated the other and were not adoptive admissions. The People took the position that all the statements were either party admissions (that implicated only the speaker) or adoptive admissions because they put Hunt and Taylor at the scene of the crime. The trial court

26

determined that the "vast majority" of the joint interview did not constitute adoptive admissions, but admitted, over defense objection, a redacted portion of the interview.

The redacted interview was played to Hunt and Taylor's jury. In the interview, Hunt and Taylor admitted they went to the doughnut shop with Wallace the morning of the murder. The detective then asked about the argument immediately before the shooting. Taylor said the argument was between the victim and Wallace; Hunt said he did not see it because he was on Taylor's phone. Taylor said he did not see Hunt on the phone, and Hunt did not use his phone. Hunt said he must have been on Wallace's phone, but Taylor would not confirm that. Disregarding defendants' quibbling over the phones, the trial court found this portion of the interview was an adoptive admission because both defendants effectively admitted to being at the murder scene--"they are both present and not denying that they were there." It opined the dispute over the phone was "really of little consequence, I suspect."

In the next admitted portion of the interview, Hunt said Wallace was arguing with the victim and Taylor was also arguing or perhaps trying to break it up. Hunt claimed he was not paying attention, and then heard shots. When asked what happened next, Hunt responded, "And we all ran." Taylor then responded: "I mean, bro, this, bro, like keep it solid gold, bro. You feel me? Like niggers, bro. We all (unintelligible). We keep playin this game, bro, we just gonna be over, bro. I don't see this, bro, and I'm not--I don't give a fuck no more, bro, cause I'm not gonna play this game, bro. Already know bro. Niggers got everybody, bro. You know I told you my side of the story, bro, already but--" Although the court found Taylor's final statement meaningless other than showing "a lack of articulation," it nonetheless admitted this portion of the interview, which for convenience we will refer to as Taylor's final statement.

2. The Law

"The confrontation clause of the Sixth Amendment to the federal Constitution, made applicable to the states through the Fourteenth Amendment, provides that '[i]n all

27

criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'  The right of confrontation includes the right of cross-examination.  [Citation.]"  (*People v. Fletcher* (1996) 13 Cal.4th 451, 455 (*Fletcher*).)

A recurring issue in the confrontation context is the admission of one defendant's out-of-court confession or admission that incriminates another defendant in a joint trial.  (*Fletcher, supra,* 13 Cal.4th at p. 455.)  As the *Fletcher* court explained, the statement is admissible against the declarant, but generally not against other defendants.  A court may admit the statement against only the declarant, instructing the jury to consider it only in determining the guilt of the declarant.  The United States Supreme Court, however, has determined it may be impossible for a jury to disregard one defendant's confession that is " 'powerfully incriminating' " against a second defendant.  Admission of a nontestifying defendant's confession or admission violates the codefendant's confrontation rights where the confession or admission is " 'powerfully incriminating' " and " 'facially incriminating.' "  (*Ibid*.)

The rule is different where the nontestifying defendant's statements qualify as adoptive admissions.   "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth."  (Evid. Code § 1221.)  "If a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution, and he fails to speak, or he makes an evasive or equivocal reply, both the accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt."  (*People v. Preston* (1973) 9 Cal.3d 308, 313-314.)

"Moreover, it is well settled that an adoptive admission can be admitted into evidence without violating the Sixth Amendment right to confrontation 'on the ground

that "once the defendant has expressly or impliedly adopted the statements of another, the statements become *his own admissions*, and are admissible on that basis as a well-recognized exception to the hearsay rule." ' [Citations.]" (*People v. Cruz* (2008) 44 Cal.4th 636, 672.) When a defendant has adopted the statement of another, the defendant becomes the declarant and there is no witness against him to confront or cross-examine. (*Jennings*, *supra*, 50 Cal.4th at p. 662.)

### 3. Analysis

Here, the jury was instructed that each defendant's statements were admissible against only him unless the jury found the statement was an adoptive admission. The court also instructed the jury on the requirements for an adoptive admission. Therefore, the issue is whether the statements Hunt objects to were adoptive admissions, in which case there is no confrontation issue, or if not, whether such statements were "powerfully incriminating" and "facially incriminating" such that the jury could not follow the instruction to use such statements only against the defendant who made them. Only if the latter is true did the admission of Taylor's statements violate Hunt's right to confrontation.

Hunt does not assign error to admission of the portions of the joint interview where he and Taylor describe their meeting at the doughnut shop, and Wallace's argument with Johnson. These statements were all party admissions not implicating the other or adoptive admissions as both Hunt and Taylor concurred as to the contents of the statement. Hunt does object to Taylor's statements disputing whether Hunt used his phone or was using Wallace's phone during the argument and whether Hunt observed a "tussle." The trial court admitted these statements as adoptive admissions because both Hunt and Taylor were admitting their presence when Johnson was shot. Hunt claims Taylor was directly contradicting Hunt's story as to precisely what Hunt was *doing* during the shooting.

29

Although in the end Hunt agreed with Taylor that he must have been using a different phone, Wallace's rather than Taylor's, we agree that Hunt did not adopt Taylor's statements denying that Hunt was on the phone. We find, however, that the admission of these statements did not violate Hunt's right to confrontation because we agree with the trial court that the dispute about Hunt being on the phone was of little consequence. While Taylor's statements did slightly dispute Hunt's version of events, the statements were by no means "powerfully incriminating." (See *Bruton v. United States* (1968) 391 U.S. 123, 135 [20 L.Ed.2d 476].) In *Bruton*, a witness testified the codefendant confessed that he and Bruton committed the armed robbery. (*Id*. at p. 124 [20 L.Ed.2d at p. 478].) The high court found that in this context, "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." (*Id*. at p. 135 [20 L.Ed.2d at p. 485].) Here, the disputed statements do not directly implicate Hunt in the murder; rather, they speak only to his awareness immediately prior. Hunt could have directly observed the argument or "tussle" between Wallace and Johnson (rather than having been on the phone) and still have had no criminal liability for Johnson's murder. Taylor's statements were not "powerfully incriminating" or "facially incriminating" as to Hunt, so there is no reason to conclude the jury could not follow the instruction to consider them only against Taylor.

We also find no adoptive admission of Taylor's final statement. Because the redacted interview ends at this point, we cannot tell whether Hunt adopted it by words or conduct or at all. Further, we cannot discern exactly what Taylor is saying. Hunt argues the final statement indicates that Taylor was not only disputing Hunt's version of events but also claiming that Hunt was evading the truth that he was the shooter. Hunt reasons that because Taylor had identified Hunt as the shooter in his individual interview with the police, and Taylor made reference in his final statement to having already told his side of

30

the story, the jury could infer that Taylor had identified Hunt as the shooter and his final statement implicated Hunt by challenging his denials.

This reasoning fails, however, because the jury did not hear about Taylor's identification of Hunt as the shooter. While the probation report contained a description of Hunt's and Taylor's individual interviews with the police, in which Taylor did identify Hunt as the shooter, these interviews were not played to the jury. Having reviewed the entire trial transcript and the video of the redacted portion of the joint interview, we do not find that the jury would have understood Taylor's final statement to be challenging Hunt for denying his role as the shooter.

The meaning of Taylor's final statement was ambiguous at best, unintelligible at worst, and the jury could easily have interpreted it simply as Taylor expressing his frustration with being questioned by the police. Given its ambiguous nature, we do not find that it was "facially" and "powerfully incriminating" as to Hunt, such that the jury could not follow the instruction to consider Taylor's statements against only Taylor unless they were adoptive admissions. We presume the jury followed the court's instructions. (*People v. McKinnon* (2011) 52 Cal.4th 610, 670.) Accordingly, admission of Taylor's final statement did not violate Hunt's confrontation rights.

C. *Hunt's and Taylor's Exoneration of Wallace as Rebuttal Evidence*

Hunt contends the trial court erred in permitting the People to present "rebuttal" evidence that both Hunt and Taylor told the police that Wallace was not the shooter. This evidence was not presented until after Hunt and Taylor had rested. Hunt contends it was not proper rebuttal evidence, and there was no good reason that the People could not have introduced it in their case-in-chief. He argues he was prejudiced by the late admission of this evidence because it allowed the People to unduly emphasize the evidence by introducing it late.

31

### 1. Background

When the parties first discussed admission of the joint interview, the prosecutor referenced a portion of the interview where the detective walked Hunt and Taylor through the events and told them the police did not know who the shooter was. She stated she could not find the referenced portion at that moment but wanted "maybe" to include it. The court recognized that portions of the interview not expressly admitted at that hearing could become relevant during trial.

The People rested their case-in-chief without attempting to admit this portion of the joint interview. Taylor then presented his case, which consisted only of the testimony of Detective Bryce Heinlein that when he interviewed Christy Martin, she was wearing the jacket that Hunt wore in the video from the doughnut store. Hunt rested without presenting any evidence.

The court and counsel met outside the presence of the jury to discuss the People's request to admit an additional portion of the joint interview to Hunt and Taylor's jury-- where both Hunt and Taylor said no when asked if Wallace was the shooter. Hunt objected because he subsequently said in the interview that he said no only because Taylor did. The court ruled the additional portion of the interview, including Hunt's subsequent retraction, could be admitted.

After Taylor and Hunt rested their cases, the court asked the prosecutor if she had rebuttal evidence. She said yes, and called Detective Heinlein to testify that during the joint interview when Detective Higgins asked Hunt and Taylor if Wallace was the shooter, both said "nope." Higgins then told Hunt and Taylor, "[T]hat's why we are here" (suggesting that if Wallace was not the shooter, Taylor or Hunt was). Hunt then claimed that "he only said no" because "[Taylor] said no."

Hunt objected that Heinlein was not a true rebuttal witness. The court agreed that was "technically correct" but observed that the evidence could not have been introduced earlier, as it was the subject of much ongoing discussion amongst the parties and the

32

court--they had "hashed it around" for at least a day. The court declined to explain to the jury that this evidence was not true rebuttal evidence, as the jury had already been told that the prosecutor would have some additional questions for the detective (because Taylor was planning on calling him as a defense witness).

2. The Law

Section 1093 sets forth the proper order in which a criminal trial shall proceed. Subdivisions (c) and (d) provide: "(c) The district attorney, or other counsel for the people shall then offer the evidence in support of the charge. The defendant or his or her counsel may then offer his or her evidence in support of the defense. [¶] (d) The parties may then respectively offer rebutting testimony only, unless the court, for good reason, in furtherance of justice, permit [*sic*] them to offer evidence upon their original case." Section 1094 provides: "When the state of the pleadings requires it, or in any other case, for good reasons, and in the sound discretion of the court, the order prescribed in Section 1093 may be departed from."

" 'If evidence is directly probative of the crimes charged and can be introduced at the time of the case in chief, it should be.' [Citation.] '[P]roper rebuttal evidence does not include a material part of the case in the prosecution's possession that tends to establish the defendant's commission of the crime. It is restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt.' [Citation.] [¶] The reasons for the restrictions on rebuttal evidence are 'to (1) ensure the orderly presentation of evidence so that the trier of fact is not confused; (2) to prevent the prosecution from "unduly magnifying certain evidence by dramatically introducing it late in the trial;" and (3) to avoid "unfair surprise" to the defendant from sudden confrontation with an additional piece of crucial evidence.' [Citations.]" (*People v. Mayfield* (1997) 14 Cal.4th 668, 761.)

"Courts have interpreted sections 1093 and 1094 as giving a trial court 'broad discretion to order a case reopened and allow the introduction of additional evidence [citations].' [Citation.] 'No error results from granting a request to reopen in the absence of a showing of abuse. [Citation.]' [Citation.]" (*People v. Riley* (2010) 185 Cal.App.4th 754, 764 (*Riley*).) "We review for abuse of discretion a trial court's ruling on a motion to reopen a criminal case to permit the introduction of additional evidence. [Citations.]" (*People v. Marshall* (1996) 13 Cal.4th 799, 836.)

In determining whether a trial court has abused its discretion in ruling on a request to reopen, we consider the following factors: " '(1) the stage the proceedings had reached when the motion was made; (2) the [moving party's] diligence (or lack thereof) in presenting the new evidence; (3) the prospect that the jury would accord the new evidence undue emphasis; and (4) the significance of the evidence. [Citations.]' [Citation.]" (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 793.)

In *Riley,* defendant moved for acquittal under section 1118.1 after the close of the People's case-in-chief on the ground that there was no evidence that the .47 grams of marijuana found in the defendant's purse constituted a usable amount. (*Riley, supra,* 185 Cal.App.4th at p. 759.) The appellate court found the trial court properly allowed the People to reopen in order to present such evidence. "[W]e conclude that section 1118.1 does not place a limitation on the trial court's discretion under sections 1093 and 1094 to permit either party to reopen its case for good cause and when justice so requires. The purpose of section 1118.1 is to provide a procedure by which a defendant may promptly terminate a fatally deficient prosecution, not to provide the defendant with a tactical trap when the prosecution inadvertently fails to present evidence in its possession." (*Id.* at p. 766.) The *Riley* court relied on *People v. Goss* (1992) 7 Cal.App.4th 702, 708: "The court always has discretion to allow the prosecution to reopen after a section 1118 motion so long as the court is convinced that the failure to present evidence on the issue was a

result of 'inadvertence or mistake on the part of the prosecutor and not from an attempt to gain a tactical advantage over [the defendant].' [Citation.]"

C. *Analysis*

We classify the presentation of "rebuttal evidence" as what it really was-- permitting the People to reopen their case--and find no abuse of discretion. The trial court explained the reason for the delay in presenting this evidence and the prosecutor's failure to introduce the evidence earlier, although sloppy, was more excusable than the oversight in *Riley*. Neither Hunt nor Taylor claimed to be surprised by the additional evidence, and it was not nearly as significant in establishing the case against defendants as that evidence admitted late in *Riley*, which established an element of the crime charged. Nothing suggests the prosecutor sought to obtain a tactical advantage by offering this evidence late; rather it appears the delay was caused by inadequate preparation. Hunt fails to make a convincing showing that the jury placed undue weight on this evidence to his prejudice.

D. *Instruction on Premeditation and Deliberation After Jury Deadlock*

Hunt contends the trial court prejudicially erred in instructing the jury on premeditation and deliberation when the jury announced it was deadlocked on first degree murder. He contends the error was three-fold: (1) the court refused to reiterate CALCRIM No. 521; (2) the court erred in elaborating on the pattern instruction, conflating the definition of premeditation and deliberation with the sufficiency of the evidence, creating an improper pinpoint instruction; and (3) the court erred in refusing Hunt's request to modify the court's instruction to focus the jury on the legal standard of the extent of deliberation.

1. Background

The trial court originally instructed the jury with CALCRIM No. 521 as follows:

"A defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately and with premeditation. [¶] The defendant acted willfully if he carefully weighed the considerations for and against his choice, and knowing the consequences, decided to kill. [¶] The defendant acted with premeditation if he decided to kill before completing the act that caused death. [¶] The length of time a person spends considering whether he kills does not alone determine whether the killing is deliberate or premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. [¶] The decision to kill made rashly, impulsively or without careful consideration is not deliberate and premeditated. [¶] On the other hand, a cold calculating decision to kill can be reached quickly. [¶] The test is the extent of the reflection, not the length of time. [¶] The requirements for second degree murder, murder based on express or implied malice, are explained in CALCRIM 520, first or second degree murder with malice aforethought. [¶] The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder."

Hunt and Taylor's jury began deliberations on February 2, 2012. On February 14, 2012, the jury announced it had reached a verdict on count 5 but could not reach a verdict on count 3, murder, for either defendant. The court asked if any clarification of the instructions would assist the jury. The foreperson responded, "The two words that are hanging everybody up are the 'deliberate' and 'premeditated.' [¶] . . . [¶] Mostly the latter." The court indicated that counsel would work on providing some guidance.

The trial court proposed an additional instruction and submitted it to counsel. The instruction was based, in part, on *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), regarding the type of evidence that shows premeditation and deliberation. Both Hunt and Taylor requested that the court read CALCRIM No. 521 again; Hunt wanted the court to add that absent evidence of Hunt's actions before the killing, there was no proof of premeditation and deliberation.

Both Taylor and Hunt objected to the court's proposed instruction. Taylor objected to portions and suggested a number of changes. If the court was to give its proposed instruction, Hunt insisted that "the balance of the *Anderson* definition of

36

premeditation be given, i.e., . . . 'as a deliberate judgment or plan, carried on cooly and steadily, [especially] according to a preconceived plan.' "

The trial court incorporated Taylor's suggested changes, but not Hunt's. The court instructed the jury as follows:

> "In response to your request for a further clarification of the terms 'premeditation and deliberation' contained in CalCrim 521, the court submits the following.

> "Premeditation and deliberation is not synonymous with malice aforethought as defined in CalCrim 520. In order for you to find the defendant guilty of First Degree Murder you must find that the defendant not only acted with the specific intent to kill but acted with premeditation and deliberation.

> "Premeditation means to think on and resolve in the mind beforehand, to contrive and design previously, it implies deliberate judgment or plan according to a preconceived plan. Although premeditation requires that the defendant decided to kill before completing the act that caused death, the time period for premeditation may be no greater than is necessary to form the intent to kill. The formation of the intent to kill and the acts causing death may occur in rapid succession. The test is not the period of time during which a thought must be pondered before it can ripen into an intent to kill which is premeditated but the extent of the reflection on the part of the defendant.

> "The term 'deliberate' means that the defendant formed, arrived at, or determined the intent to kill as a result of careful thought and weighing of considerations. One who acts in haste, impetuously, rashly or impulsively does not act with deliberation.

> "The presence or absence of premeditation and deliberation may be determined from the consideration of both the direct and circumstantial evidence presented in this case. 'You may consider any evidence presented to you in this trial on the issue of premeditation and deliberation. Although you may consider any evidence presented to you in this trial on the issue of premeditation and deliberation, factors such as any pre-planning activity or motive, and the manner of killing, may be relevant to this issue. As judges of the facts, you are to determine the presence or absence of any factors bearing on premeditation and deliberation.'

37

"The people have the burden of proving the existence of premeditation and deliberation by proof beyond a reasonable doubt. If the people have not met this burden, you must find the defendant not guilty of First Degree Murder."

The jury reached verdicts the next day, finding Hunt guilty of first degree murder and Taylor of second degree murder.

B. *Analysis*

Hunt first contends that the trial court erred in declining to re-read CALCRIM No. 521. He argues the jury's "difficulty" was not with the CALCRIM instruction, but with the "borderline" evidence on the question.

Section 1138 provides in relevant part: "After the jury have [*sic*] retired for deliberation, . . . if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given. . . ." "The court has a primary duty to help the jury understand the legal principles it is asked to apply. [Citation.]" (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.) "Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.]" (*Ibid.*)

First, the trial court did not abuse its discretion by declining to repeat CALCRIM No. 521. The court has no duty to give a repetitious instruction. (*People v. Turner* (1994) 8 Cal.4th 137, 203.) Nor did the court disregard its duty to assist the jury; it did so by crafting a clarifying instruction with counsels' input.

Hunt next contends the court's instruction "conflated the definition of premeditation and deliberation with the probative value and sufficiency of the evidence in that regard." He contends the instruction given was an improper pinpoint instruction,

favoring the prosecution by highlighting certain evidence, namely pre-planning activity, motive, and manner of killing.

An improper pinpoint instruction is one that implies certain conclusions from specified evidence. (*People v. Wright* (1988) 45 Cal.3d 1126, 1137.) The clarifying instruction told the jury it could "consider *any* evidence presented to you in this trial on the issue of premeditation and deliberation." While the instruction suggested evidence of "any pre-planning activity or motive, and the manner of killing, may be relevant to this issue," nothing in the instruction implied that the jury should draw a particular conclusion from this evidence. Indeed, Hunt has argued consideration of those factors shows insufficient evidence of premeditation and deliberation in this case. (See Part III A *ante*.)

Hunt faults the clarifying instruction for its failure to focus the jury on the "extent of deliberation," an error he claims was compounded by the trial court's refusal to add the additional language from *Anderson* he requested. He points especially to the portion of the instruction that stated, "the time period for premeditation may be no greater than is necessary to form the intent to kill." The clarifying instruction, however, made clear that the test was not time, but the extent of reflection. "The test is not the period of time during which a thought must be pondered before it can ripen into an intent to kill which is premeditated but the extent of the reflection on the part of the defendant."

In reviewing a challenge to an individual jury instruction for correctness or completeness, we evaluate the instructions given as a whole, not in isolation, to determine whether there is a reasonable likelihood they confused or misled the jury and thereby denied the defendant a fair trial. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 182.) Here, both instructions on premeditation and deliberation, CALCRIM No. 521 and the clarifying instruction, stressed the key issue was defendant's extent of reflection. The clarifying instruction told the jury, "Premeditation means to think on and resolve in the mind beforehand, to contrive and design previously, it implies deliberate judgment or

plan according to a preconceived plan."  Hunt has failed to show error in the clarifying instruction on premeditation and deliberation.

E.  *Improper Gang Expert Testimony*

Hunt contends the trial court abused its discretion in admitting testimony of the gang expert, MacLafferty.  Specifically, he contends it was error to admit expert testimony that the homicide was gang related and that there was no other motivation for the killing, because these opinions invaded the province of the jury to determine Hunt's guilt and the truth of the gang allegations.  Hunt further contends it was error to permit expert testimony on the group dynamic.  He argues this testimony violated *Killebrew, supra,* 103 Cal.App.4th 644, because it was testimony about a specific defendant's intent.

For the reasons set forth *ante* in our response to Wallace's nearly identical contention, we reject Hunt's contention challenging the expert testimony about the group dynamic and his contention that the expert testimony violated *Killebrew*.  As we have explained, MacLafferty's testimony addressed the habits, usual practices, and expectations of gang members.  It was permissible gang expert testimony that the murder was gang related.  (*Hernandez, supra*, 33 Cal.4th at p. 1049; *Olguin, supra,* 31 Cal.App.4th at p. 1371.)

Hunt specifically objects to MacLafferty's testimony that the investigation did not reveal any motivation for the killing other than the gang motivation.  He contends this was impermissible testimony, usurping the jury's function to determine guilt, relying on *People v. Spence* (2012) 212 Cal.App.4th 478 (*Spence*).  He argues MacLafferty was simply giving his opinion as to the truth of the gang allegations.

In *Spence*, a sexual assault case, the prosecutor asked the expert physician, "if someone by the name of [D.] says that she is sexually assaulted by someone by the name of James Spence, is there any evidence that you tested in this case that contradicts that story?"  (*Spence, supra,* 212 Cal.App.4th at p. 507.)  On appeal, defendant contended the question and answer deprived him of due process by going beyond the proper scope of

expert opinion and allowed the expert to usurp the jury's function by rendering findings of fact. (*Id.* at p. 506.) The parties disagreed whether the question was a hypothetical question asking the expert to opine on guilt, or simply an inquiry if the tests conducted were able to exclude defendant. (*Id.* at pp. 509-510.) The court found "the more realistic approach in analyzing this dispute is to acknowledge that the medical expert arguably was asked to testify directly about the guilt of Spence, since the question posed named him and essentially asked whether he had any meritorious defense in the evidence, or was guilty. . . . [¶] . . . [T]his question tended to interfere with the jury's ability to decide the ultimate issues, including the probativeness of the laboratory tests, and also the credibility of D. in naming Spence as the accused. [Citation.]" (*Id.* at p. 510.) The court disapproved this form of questioning but found any error harmless in light of the other evidence of defendant's guilt. (*Ibid.*)

We find the question at issue different from the one asked in *Spence*. The prosecutor asked MacLafferty if the investigation found any motivation for the killing other than the gang motivation. Rather than asking if defendants had a defense, as the court interpreted the question in *Spence,* here the question asked about the results of the investigation, without any reference to Hunt or the other defendants. The question elicited whether the police found any evidence of personal animosity between Johnson and the defendants unrelated to gang affiliation, such as a dispute over money or property or a woman. As such, it was not an improper question seeking only the expert's opinion as to how the case should be decided.

F. *Cumulative Error*

Finally, Hunt contends the cumulative effect of the errors requires reversal. Because we find no error, defendant's cumulative error argument fails. (*In re Reno* (2012) 55 Cal.4th 428, 483 [there cannot logically be cumulative error when there are no errors to cumulate].)

## DISPOSITION

As to Wallace, we reverse count 2 and otherwise affirm the judgment against him. As to Taylor, we reverse count 5 and the accompanying gang enhancement. As to both, we direct the trial court to amend the abstracts of judgment accordingly. As to Taylor, we further direct that the amended abstract reflect the firearm enhancement imposed on count 3 was pursuant to section 12022.53, subdivisions (d) and (e)(1).

As to Hunt, the judgment is affirmed.

The trial court shall forward certified copies of the amended abstracts of judgment for Wallace and Taylor to the Department of Corrections and Rehabilitation.


          DUARTE         , J.


We concur:


      RAYE          , P. J.


      MURRAY       , J.